**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ROSEVILLE EMPLOYEES'
RETIREMENT SYSTEM, Individually and
On Behalf of All Others Similarly Situated,

                Plaintiffs,

      vs.

NOKIA CORPORATION, OLLI-PEKKA
KALLASVUO, RICHARD A. SIMONSON,
and KAI OISTAM,

                Defendants.

<u>MEMORANDUM DECISION</u>
AND ORDER

10 CV 00967

GEORGE B. DANIELS, District Judge:

Nokia Corporation (hereinafter, "Nokia" or the "Company") has been a worldwide leader

in mobile communications for many years. Upon entering fiscal year 2008, Nokia was faced

with the unavoidable reality of changing market dynamics. There was an industry-wide decline

in device ASP, the *average selling price* of mobile devices, due to burgeoning emerging mobile

markets like China, India, and Africa, and competitive factors in general. Lead Plaintiff Pension

Trust Fund for Operating Engineers contends that, faced with this outlook, Nokia and certain of

its officers and board members[1] (collectively, the "Defendants") made various false and

misleading statements about Nokia's market position from January 24, 2008, to September 5,

2008, (hereinafter, the "Class Period") that defrauded the market by causing the price of

American Depository Shares of Nokia (or "Nokia ADS") to be overvalued. Plaintiff asserts

---

[1] The Individual Securities Defendants are officers and board members: Olli-Pekka Kallasvuo,
Nokia's President and Chief Executive Officer and Chairman of Nokia Group's Executive Board; Richard
A. Simonson, Nokia's Executive Vice President and Chief Financial Officer and a Nokia Group
Executive Board member; and Kai Oistamo, Nokia's Executive Vice President of its Devises segment and
Nokia Group Executive Board member. Securities Complaint ("SC") ¶¶ 14-17.

1

claims against the Defendants based on those statements for violation of Section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, and for control

party liability pursuant to Section 20(a) of the Exchange Act.  Defendants have moved to dismiss

the Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Defendants' motion to dismiss is GRANTED.

## BACKGROUND

Nokia conducted its operations via three reportable segments during the Class Period,

including the segment at issue in this lawsuit, Devices & Services ("D&S").  Amended

Complaint for Violation of the Federal Securities ("AC") ¶ 27.  D&S was responsible for

designing, developing, and producing Nokia's mobile device portfolio, ranging from entry-level

mobile devices primarily for voice and text messaging to higher-priced "smartphones" that allow

users to take and send photographs, listen to music, access email and the internet.  AC ¶ 27;

Declaration of Daniel C. Lewis, Ex. B, 2008 20-F, at 30-31.  Throughout the Class Period, D&S

generated almost all of Nokia's operating profit each quarter.  AC¶ 30.  Other metrics used by

Nokia to measure and report on the competitive performance of D&S included: (a) device ASP,

the average selling price at which Nokia mobile devices are sold;[2] (b) mobile device volume, the

number of Nokia mobile devices sold; and (c) market share, the estimated percentage of all

mobile devices sold that are Nokia mobile devices.  Lewis Decl., Ex. B, at 58, 60, 74-75.

Plaintiff claims that the Defendants perpetrated a fraud to convince the market that Nokia

would not suffer a material adverse effect from the changing market dynamics.  One aspect of

this alleged fraud was making statements to mislead investors into believing that Nokia had a

---

[2]  "Device ASPs are impacted by overall industry dynamics, in particular the growth of the emerging markets as previously discussed, and competitive factors in general. Our ASPs are also impacted by our own product mix, for example the proportion of low-end, mid-range and high-end devices, as well as the overall competitiveness of our product portfolio." Lewis Decl., Ex. B, at 60.

"very strong" position in the emerging market arena and that Nokia was able to and, in fact, was competing in that market.  Plaintiff contends that these statements were false and misleading because the reality was that declining device ASPs were having a material adverse affect on Nokia's operating performance and Defendants made a high level internal policy decision to abstain from competing on price in the Chinese market during the Class Period.  The other aspect of the alleged fraud was that Defendants failed to disclose that Nokia was experiencing production related delays with a new, more profitable product.  Plaintiff contends that the delays arose due to problems with the development of the Symbian-based operating system, S60, and that Defendants hid this fact when highlighting Nokia's expected launch of new phones.

The alleged fraudulent conduct included that, on January 24, 2008, Nokia presented the financial results for Q4 2007.  AC ¶¶ 34-37.  The Company announced that the operating profit for D&S sequentially increased by 48%.  AC ¶ 35.  Mobile device volume sequentially increased by 27%, and market share sequentially increased in every region except North American and Latin America.  AC ¶ 37, pg. 9-10.  However, device ASP sequentially decreased from EUR 89 (Q4 2006) to EUR 83 (Q4 2007).  AC ¶¶ 32, 35, 37, pg. 9-10.  Nokia predicted a similar trend for 2008.  Specifically, Nokia advised the market that it expected: (a) sequentially flat market share in Q1 2008, but that it "continues to target an increase in its market share in 2008"; (b) "some decline in industry ASPs [in 2008], primarily reflecting the increasing impact of the emerging markets and competitive factors in general"; and (c) growth in mobile device volumes in 2008.  AC ¶ 38.

Also, on January 24, 2008, during a conference call with investors, Nokia made statements about its outlook for 2008 that allegedly led investors to believe that Nokia was well-positioned to compete in the emerging markets, was vigorously competing, and had already been

successful.  AC ¶ 47, pg. 13, 15.  Nokia described China as an emerging market with higher device ASPs, but explained that it had not yet observed a change in market dynamics in that market.  AC ¶ 47, pg. 16.  Finally, Nokia made statements that allegedly "touted" its new product offerings for the first quarter.  AC ¶¶ 40-41, 46, 47, pg. 14-15, 53.

On February 11, 2008, Nokia previewed some of its new product offerings at an annual mobile communications industry conference.  AC ¶ 53, pg. 21.  Nokia projected that new smartphones using the S60 operating system would begin shipping in the Q2 2008 and throughout the remainder of the year.  Ex. 3, Transcript (Feb. 11, 2008), at 5.  Nokia also projected that a new version of the S60 operating system that could be used in connection with touch screen mobile devices would be released "in the second half of the year."  AC ¶ 53, pg. 22. Then, on April 2, 2008, Nokia announced four new devices, with shipping expected to begin in the second or third quarter depending on the device.  AC ¶ 55, pg. 23-24.

On April 17, 2008, Nokia announced its financial results for Q1 2008.  AC ¶ 58.  Nokia had experienced sequential declines in D&S operating profit, mobile device volume, market share, and device ASP, though Nokia was up year on year on all these metrics except device ASP.  AC ¶ 58, pg. 24-26.[3]  Defendant Kallasvuo commented that "[t]he overall device market developed as expected, with the greatest demand in emerging markets, where our position is very strong"; and that "[w]hile we will not have major new products shipping in the second quarter, we expect a number of new products to be shipping, and to have a positive impact on our results, in the second half of 2008."  AC ¶ 58, pg. 26.  During a conference call with

---

[3]  The operating profit for D&S of 21.2% was up year on year from 16.0% and down sequentially from 22.8%.  AC ¶ 58, pg. 24.  Mobile device volumes were up 27% year on year and down 13% sequentially.  AC ¶ 58, pg. 25.  Market share of 39% was a year on year increase from 36% and sequential decrease from 40%.  AC ¶ 58, pg. 25.  Finally, device ASP of EUR 79 reflected both a year on year and sequential decrease from EUR 89 and EUR 83, respectively.  AC¶ 58, pg. 26.

investors on the same day, Nokia continued to represent the decline in device ASP as a positive development, giving Nokia a competitive advantage: "It may not be good for others, but it's good for Nokia because we're able to deliver sales growth there. That's where we're best positioned." AC ¶ 60, pg. 29; see generally AC ¶ 60, pg. 27-30.  When asked if "there has been anything that has caused any delay, any technical difficulties" in light of the fact that Nokia was "very optimistic about the pipeline of new products and things seems to be a little bit quieter," Defendant Kallasvuo responded: "Yes, there is always some volatility - or cyclicality when you are introducing new products and it's not out of the ordinary here in any way. . . . We have a very good handle on the schedules here." AC ¶ 60, pg. 30.

On July 17, 2008, Nokia announced its financial results for Q2 2008.  AC ¶ 65.  Nokia had again experienced sequential declines in D&S operating profit and device ASP, but for the first time that year had sequential increases in both mobile device volume and market share.[4] AC ¶ 65, pg. 32-34.  As in the previous quarter, Nokia was up year on year on all these metrics except device ASP.  Nokia continued its optimistic statements on device ASPs and new product releases.  AC ¶¶ 65, pg. 34, 66-68.  Nokia also reported having already shipped new smartphones during the second quarter.  See, e.g., AC ¶ 65, pg. 36.

Finally, on September 5, 2008, the date that Plaintiff alleges that the fraud was revealed, Nokia issued a press release cutting its market share outlook for Q3 2008.  AC ¶ 71, pg. 41. Nokia announced that it expected market share to decline, rather than to be sequentially flat as it

---

[4] The operating profit for D&S of 20.1% was up year on year from 19.4% and down sequentially from 21.2%.  AC ¶ 65, pg. 32.  Mobile device volumes were up 21% year on year and up 6% sequentially.  AC ¶ 65, pg. 32-33.  Market share of 40% was a year on year increase from 38% and sequential increase from 39%.  AC ¶ 65, pg. 32-33.  Finally, device ASP of EUR 74 reflected both a year on year and sequential decrease from EUR 90 and EUR 79, respectively.  AC ¶ 65, pg. 33, 34.

predicted at the release of the Q2 2008 results.  AC ¶ 71, pg. 43.  Nokia offered various reasons for its decision, including "aggressive pricing of some competitors, the overall market competition, including the entry markets, and the temporary impact of a slower ramp-up of a mid-range Nokia device."  AC ¶ 71, pg. 43.  That day, on a conference call with investors, Nokia further explained that the expected decline was "related to units" because Nokia was "not meeting certain aggressive pricing that [it] believe[s] may not be sustainable" "in certain markets and in certain areas, including in some of the low end."  AC ¶ 72, pg. 44.  Nokia also noted that "since some of that aggressive pricing . . . is going on, particularly in the low end, and we are not participating . . . , that actually is a positive for ASPs in our case," but that the "slower ramp-up in this mid-range product . . . is negative for our ASPs."  AC ¶ 72, pg. 44.  Plaintiff alleges that, in response to these statements, the price of Nokia ADS declined approximately 8%, falling from $22.31 to $20.60.  AC ¶ 80.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937,1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555

The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support

thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiffs favor. Chambers v. Time Warner. Inc., 282 F.3d 147, 152 (2d Cir. 2002). In deciding a motion to dismiss, the Court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns v. Shaar Fund. Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

In the context of securities fraud claims, a complaint must meet heightened pleading requirements. A plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" pursuant to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Id. at 99; see also 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

## SECURITIES ACTION

### A. SECTION 10(b) CLAIM

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5,

17 C.F.R. § 240.10b-5(b), states that it "shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." To state a claim in a private action under section 10(b) and Rule 10b-5, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission [or transaction causation]; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)); Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). Here, the Defendants are entitled to dismissal of the Section 10(b) claim because Plaintiff has failed to plead either an actionable misstatement or omission, scienter, or loss causation.

### 1.      Material Misstatement or Omission

The Complaint details numerous statements made by the Defendants during the Class Period that were allegedly false or misleading. However, after reviewing each statement, this Court finds that none of the statements in the Complaint, as alleged, constitute an actionable misstatement or omission upon which Plaintiff may assert a Section 10(b) claim.

#### a.      *Statements Concerning Financial Results*

The statements wherein Nokia or an Individual Securities Defendant merely reported Nokia's financial results are not actionable. See, e.g., AC¶¶ 35, 37, 58, 60, 65, 66. Plaintiff never alleges that the historical information conveyed in these statements was inaccurate, whether due to an incorrect calculation or improper reporting of the actual financial results. "Accurate statements about past performance are self-evidently not actionable under the

8

securities laws." Nadoff v. Duane Reade, Inc., 107 Fed. Appx. 250 (2d Cir. 2004) (affirming sub nom In re Duane Reade Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 21319, at *23 (S.D.N.Y. Nov. 24, 2003) ("[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.")).

### b.    *Statements Concerning Projected Outlook*

The statements wherein Nokia or an Individual Securities Defendant disclosed Nokia's projected outlook – including expected financial results, plans to improve market share and profit margins, and future new product releases – are not actionable pursuant to the forward-looking statement safe harbor. See, e.g., AC¶¶ 38, 56, 58, 59, 60, 66.  The PSLRA "safe harbor" provision shields a defendant from liability where "the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton v. Am. Express Co., 604 F.3d 758, 765-66 (2d Cir. 2010) (emphasis in original); see also 15 U.S.C. § 78u-5.

Here, the statements at issue satisfy the PSLRA definition of forward-looking. See 15 U.S.C. § 78u-5(i)(1)(A)-(C) ("a statement containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . .").  They were adequately identified as forward-looking by clear and objective language indicating the future-related subject matter. See Slayton, 604 F.3d at 769.  By notation, they were also accompanied by meaningful cautionary language that they were "not historical facts." see, e.g., Lewis Decl., Ex. C, Q4 2007 Release, at 25; Ex. F, Q1 2008 Release, at 14-15; Ex. H, Q2 2008 Release, at 16.

9

The substantive and company-specific disclosures included risk warnings about Nokia's ability to successfully launch new devices, the development of software, industry competition, the impact of new market segments, and declining ASPs. See, e.g., Lewis Decl., Ex. B, 2008 20-F 12-15, Ex. C, Q4 2007 Release, at 25; Ex. F, Q1 2008 Release, at 14-15; Ex. H, Q2 2008 Release, at 16. No reasonable investor could have been misled from these disclosures into thinking that the risks of new products delays and competitive markets did not actually exist or could not have adverse effects on Nokia's financial results. See In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007)(quoting Halperin v. eBanker USA.COM, 295 F.3d 352, 359 (2d Cir. 2002)) (internal quotation marks and citations omitted). Moreover, Plaintiff's factual allegations do not demonstrate that either risk had already transpired and was not disclosed at the time any of the statements at issue were made.[5] See Slayton II, 604 F.3d at 770; Shields, 25 F.3d at 1129 ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of alleging 'fraud by hindsight.'"); In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 269 (2d Cir. 1993). Nor do Plaintiff's factual allegations support the inference that the Securities Defendants either did not have these favorable opinions about the future when they made the statements, or "that the favorable opinions were without [any] basis in fact."[6] In re Time Warner, 9 F.3d at 266; see also In re Int'l Bus. Mach. Corporate Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998).

Additionally, these statements are insufficient because Plaintiff essentially accuses Defendants of offering too rosy a view of Nokia's future D&S business. It is well-established

---

[5] See, infra, discussion of Loss Causation.

[6] See, infra, note 8.

10

that "[u]p to a point, companies must be permitted to operate with a hopeful outlook" – that is, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future," and "expressions of puffery and corporate optimism do not give rise to securities violations" regardless of whether that optimism was, by hindsight, unwarranted. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994)); Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) ("[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient."); Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 811 (2d Cir. 1996) ("[G]eneral announcements by [Defendant] that it was 'optimistic about its earnings' and 'expected . . . to perform well' are puffery [that] cannot have misled a reasonable investor . . . and cannot constitute actionable statements under the securities laws."). Plaintiff, however, has set forth no factual allegations that, if true, would demonstrate that any of the Defendants' statements went beyond good faith expressions of corporate optimism.[7]

### c.    *Statements Concerning Competition*

The statements by Nokia or an Individual Securities Defendant that allegedly "downplayed" the seriousness of competitive threats in the low end, high growth market for Nokia are not actionable. See, e.g., AC¶¶ 47, 58, 60, 65, 66. Opinions and other soft

---

[7] To the extent that the forward-looking statements also constituted opinions and other soft-information, the analysis set forth under "Statements Concerning Competition" is applicable and provides an independent basis to find that such statements are not actionable.

information (i.e. feelings, perceptions, and values) are not per se inactionable.  In re Int'l Bus. Mach., 163 F.3d at 107; Novak, 216 F.3d at 315.  Such statements are actionable if a plaintiff "alleges 'with particularity' 'provable facts' to demonstrate that [any of these] statement[s] of opinion [are] both objectively and subjectively false."  Bond Opportunity Fund v. Unilab Corp., 2003 U.S. Dist. LEXIS 7838, at *15 (S.D.N.Y. May 9, 2003) (citing Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1094 (1991)), aff'd, 87 Fed. Appx. 772 (2d Cir. Feb. 10, 2004) (summary order); see also Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) ("[A] material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief.  Essentially, proving the falsity of the statement . . . is the same as proving scienter, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion.").

Here, Plaintiff's factual allegations do not show that any of the Securities Defendants "did not genuinely or reasonably believe the positive opinions they touted . . ., or that the opinions imply certainty."[8]  Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006).  It is wholly insufficient for Plaintiff to merely assert that Nokia's opinions turned out to be wrong,[9] or even that it disagrees with Nokia's interpretation of the publicly available financial data.  See In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466

---

[8]  Plaintiff offers no factual allegations regarding the genuine or actual beliefs of the Securities Defendants.  Plaintiff does allege that the Securities Defendants knew about S60 software problems and their ability to compete in the changing market.  The law requires Plaintiff to demonstrate, not that the opinion was unreasonable or that another reasonable opinion existed, but that "the opinion was without a basis in fact."  Lapin, 506 F. Supp. 2d at 239.  Even if knowledge is assumed, there is an absence of specificity about the content and timing of the Securities Defendants' knowledge to conclude that these facts "undermin[ed] the positive statements" by rendering them false or misleading.  Lapin, 506 F. Supp. 2d at 239.

[9]  See, supra, sources cited in discussion of corporate optimism.  These statements are also defective because Plaintiff essentially accuses Defendants of offering too rosy a view of Nokia's future D&S business.

12

(S.D.N.Y. 2004) ("It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held."); Podany, 318 F. Supp. 2d at 154 (S.D.N.Y. 2004) ("It is not sufficient to allege . . . that it would have been possible to reach a different opinion than that reached by defendant based on information available to defendant at the time, or even that the defendant's opinion was unreasonable."); see, e.g., AC¶ 49.  Nokia did not have the legal responsibility to disclose all or even a range of the reasonable conclusions that a prudent investor could draw from publicly available financial data.  Cf. Elliott Assocs., L.P. v. Covance, Inc., 2000 U.S. Dist. LEXIS 17099 (S.D.N.Y. Nov. 28, 2000) (noting with regards to specificity of cautionary language, that "securities laws do not require that investors be treated like children") (internal quotation marks omitted; citation omitted).  Nor did Nokia have the legal responsibility to ensure that the market was comfortable or agreed with its analysis. Plaintiff has alleged no facts that would demonstrate that Defendants had no reason to believe their stated positive opinions about the Company's future outlook.

### d.     *Statements Concerning Current Response*

The statements wherein Nokia or an Individual Securities Defendant discussed Nokia's current response to declining ASPs are not actionable.  Nokia made the following representations about its competitors on January 24, 2008: "We closely monitor developments in our markets" and "We are taking [competitors with ambitions in the low end market] very seriously. We are watching them."  AC¶ 47, pg. 13, 15; see, e.g., AC¶ 47, pg. 16.  Then, on April 17, 2008, Nokia represented that it was well-positioned to compete at the low end and in the emerging markets, even in the face of declining prices, and was actively competing.  See, e.g.,

13

AC¶ 60. Plaintiff has not offered any factual allegations demonstrating that, in January 2008, and contrary to its public statements, Nokia was not "monitoring" competitors or did not actually have any reason to believe it was prepared to respond to competitive threats. Nor has Plaintiff offered any facts demonstrating that, in April 2008, Nokia was either not competing in the identified markets, or not competing in the manner that it represented.

The September 5, 2008 statement about Nokia not participating in aggressive price cutting is also not actionable. First and foremost, none of the statements identified by Plaintiff actually state or imply that Nokia was going to compete on price. There are numerous ways that Nokia could have intended to be competitive other than selling its mobile devices at lower prices. Even if that was not the case, the September 2008 statement is about competition experienced in Q3 2008. It says nothing about what strategy Nokia was actually pursuing at the time of the January 2008 or April 2008 statements.

### e.        *Statements Omitting Software Problems*

Finally, the statements wherein Nokia or an Individual Securities Defendant failed to disclose production delays of a potential new product resulting from software problems with S60 are not actionable. An omission is actionable only if: (a) the omitted fact is material; and (b) the speaker had a duty to disclose the omitted fact. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); see also id. at 239 n.17 ("[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."); Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002) ("For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information."); In re Time Warner, 9 F.3d at 267 ("[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."). "A fact is to be considered

14

material if there is a substantial likelihood that a reasonable person would consider it important in [making investment decisions]."[10] Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994); see also  Basic, 485 U.S. at 231-32 (1988) (explaining materiality as an issue of whether the omitted fact significantly alters the total mix of information available) (quoting TACIndus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  A duty to disclose may exist "expressly pursuant to an independent statute or regulation" or "as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts."  Thesling v. Bioenvision, Inc., 374 Fed. Appx. 141, 143 (2d Cir. 2010); see also Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992).

Here, it is undisputed that Nokia had a duty to "be both accurate and complete" when commenting on a particular subject matter. Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002).  Defendants were not required, however, to disclose production delays or software problems with a particular product "merely because a reasonable investor would very much like to know that fact." In re Time Warner, 9 F.3d at 267.  The question is whether such information was necessary in light of the context, manner of presentation, and language of the statements at issue "so that what was revealed would not be so incomplete as to mislead."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y.2008) (citation omitted); see also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347 (2d Cir. 2010); Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 469 (2d Cir. 2006); In re Time Warner, 9 F.3d at 267.

---

[10] "Materiality is a mixed question of law and fact." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (citing TACIndus., 426 U.S. at 450).  Thus, in the context of a Fed. R. Civ. P. 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id. (citations omitted); accord Halperin, 295 F.3d at 357.

15

None of the statements as alleged by Plaintiff warrant such a finding.  Some statements discuss subject matters unrelated to the particular new product or software at issue.  See, e.g., AC ¶ 40 (indicating that mobile device volumes in Q4 2007 would have been higher but for component shortages and representing that shortages "have started to ease" in Q1 2008); AC ¶ 47, pg. 14 (same); AC ¶ 47, pg. 14 (discussing Q4 2007 ramp up of new products); AC ¶ 50-51 (announcing acquisition of a software company).  No reasonable investor could have plausibly understood any of these statements as relating to, or conveying information about alleged software problems or delayed new product launches.  Thus, the omission identified by Plaintiff was not so obviously important as to be material to such statements.

With respect to statements that discuss the particular new product or software at issue, Plaintiff has alleged insufficient facts about the timing and significance of the alleged software problems to demonstrate that the omission rendered the statements false or misleading.  See AC ¶¶ 47, 53, 56, 58, 60, 66.  For example, Nokia admitted to experiencing delays in April 2008 in response to a direct question.  Plaintiff's factual allegations do not demonstrate that the explanation offered by Nokia – namely, that the problem was not "out of the ordinary" and that they had control of the release schedules – was inconsistent with some existing fact.  The fact that Nokia did not provide any specific details about the delays is not determinative.  Plaintiff has failed to articulate a legal basis to find that Nokia was required to do so.  Plaintiff's factual allegations are also insufficient to conclude that, at the time various statements were made about release dates, Nokia had no reasonable basis to believe that it could meet those deadlines even in light of the alleged software problems, or that Nokia had no intention of meeting the announced release dates.  Accordingly, Plaintiff has failed to adequately plead any actionable statements made by the Defendants.

## 2.    Scienter

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead, *inter alia*, that each defendant "acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-194 (1976)).  On a motion to dismiss, the court must "consider the complaint in its entirety," inquiring "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323. "[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.  A plaintiff can satisfy this requirement by "alleging [particularized] facts (1) showing that the defendant had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[11]  ATSI Commc'ns, Inc. v. Shaar Fund. Ltd., 493 F.3d 87, 99 (2d Cir. 2007); see also 15 U.S.C. § 78u-4(b)(2) (PSLRA requirement to "state with particularity facts giving rise to a strong inference that the defendant acted with the required mental state, scienter.").

Plaintiff argues that its factual allegations are sufficient to constitute strong circumstantial evidence of recklessness.  Specifically, Plaintiff alleges that Defendants have

---

[11] Recklessness exists where the conduct is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care" in light of the fact that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142 (quoting Carter-Wallace I, 220 F.3d at 39); Novak, 216 F.3d at 308. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." Kalnit, 264 F.3d at 142 (quoting Novak, 216 F.3d at 308).

"effectively admitted" their knowledge that their public statements were inaccurate.  Pl.'s Mem., at 22 (emphasis omitted).  Plaintiff contends that the July 17, 2008 statement that Nokia did not enter an agreement regarding low-ASP mobile devices with a major Chinese telecommunications company reveals that Defendants had determined that they could no longer compete in the very markets where they claimed to have had a competitive advantage on April 17, 2008.  Plaintiff also contends that, when Defendant Kallasvuo stated that any delays or technical difficulties with new products were "not out of the ordinary" on April 17, 2008, Defendant Kallasvuo was aware of an existing delay because he assured the market that he was in a position to know about delays at that point in time.

Plaintiff's allegations fail to meet the required standard.  With respect to motive and opportunity, Plaintiff has not suggested any "concrete and personal benefit to the individual defendants resulting from the fraud," or that could have plausibly caused them to deceive shareholders.  Kalnit, 264 F.3d at 139; Novak, 216 F.3d at 307-08.  With respect to recklessness, none of the statements identified by Plaintiff can be reasonably construed to be an admission that Defendants actually possessed knowledge inconsistent with their public statements *at the time that the public statements were made*.  Even assuming that Plaintiff has drawn a proper inference from the July 17, 2008 statement, Plaintiff has offered no factual basis for its bald assertion that the competition motive underlying the July 17, 2008 statement existed on April 17, 2008.  Simply because Defendants may have taken a different position after making their public statements does not itself demonstrate that the initial position was not genuine.  Nor does it demonstrate anything about the timing of the subsequent change in position.

Similarly, with respect to Defendant Kallasvuo's statement, Plaintiff's factual allegations are insufficient.  Plaintiff has provided no factual basis to establish that there were software

18

problems, that software problems delayed one of the new products, or that the software problems existed in April 2008. Even assuming that Plaintiff has done so, Plaintiff has still failed to demonstrate that Defendant Kallasvuo knew or could have known about the software problems when he addressed investors on April 17, 2008. Defendant Kallasvuo, based upon the statements quoted in the Complaint, never made an affirmative statement that he possessed all available knowledge on new products, let alone addressed how recently he had been informed of relevant information. Plaintiff's burden to plead scienter is not satisfied by merely demonstrating that Defendant Kallasvuo made a false statement because, absent additional factual allegations, Plaintiff is not entitled to an inference that Defendant Kallasvuo must have known his statement was false. Accordingly, Plaintiff has failed to adequately allege facts giving rise to a strong inference of scienter.

### 3.    Loss Causation

"Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Emergent Capital Inv. Mgmt. v. Stonepath Group, 343 F.3d 189, 197 (2d Cir. 2003); accord Dura Pharms., 544 U.S. at 342 (2005). "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original). "[T]o establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)) (internal quotation marks omitted); id.

19

at 173-75. That is, at the pleading stage, a plaintiff must identify a corrective disclosure – that is, a statement that "reveal[s] to the market the falsity of prior recommendations" – and a resultant drop in the relevant stock's price. Id. at 175 n.4.

Plaintiff alleges that the price of Nokia ADS dropped approximately 8% on September 15, 2008, as a result of the public revelations regarding the truth about Nokia's D&S business. AC ¶¶ 73, 80. However, the September 15, 2008 statements do not constitute a corrective disclosure. See, e.g., AC ¶¶ 71, 72. The first aspect of the alleged fraud was that Nokia mislead investors into believing that Nokia had a strong market position and was well-positioned to compete. The statements disclosing that Nokia was not engaged in aggressive price cutting in Q3 2008 do not by themselves convey any information about the strength of Nokia's position in the emerging market at that time or in previous quarters. Nor do the statements convey any information that indicates that Nokia either was unable to compete, or was not competing in the emerging market in previous quarters when the alleged misrepresentations were made. Plaintiff, as previously noted, has not identified any statement wherein Nokia suggests that it was competing by price cutting. Rather, the reality is that Nokia indicated before September 2008 – albeit not as explicitly – that it was not participating in the strategy of cutting prices to take market share. See, e.g., Lewis Decl., Ex. D, January 24, 2008 Conference Call Transcript, at 12;[12] AC ¶ 60 (April 17, 2008: "And in China our sale was flat sequentially despite not

---

[12] Defendant Kallasvuo said:

But like I said, we understand that we cannot, and we should not, in fact, be too greedy with the market share, trying to take too much at one go. We need to be consistent, we need to be able to take share in a sustainable way, meaning both sustainable in terms of profitable and sustainable in the way that what you get and take you can - can maintain that overall level where you have come to, and that consistency and thinking here continues to be applicable.

participating in the low-end black and white part of the recent China mobile bundle.").

The second aspect of the alleged fraud was that Nokia hid software problems with the S60 operating system and the resulting delays to new product releases. The statements disclosing that there was a "slower ramp-up of a mid-range Nokia device" convey no specific information about the existence of any problems with the S60 software. Nokia only referred to the problem as "mundane," "not systematic," and a "quality issue" in its subsequent statements on September 15, 2008. More importantly, the statements do not speak to whether any problems or delays existed at the time the alleged misrepresentations were made earlier in the year. Plaintiff has failed to set forth a plausible factual basis for its assertion that any delay must have been caused by problems with the S60 software, or at least that the delay referenced in the public statement was software problems.[13] Accordingly, Plaintiff has failed to adequately plead loss causation.

## B.    SECTION 20(a) CONTROL PERSON LIABILITY CLAIM

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." See ATSI Communs, 493 F.3d at 108; SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Having failed to allege an underlying securities violation by Nokia pursuant to Section 10(b) and Rule 10b-5, Plaintiff's control liability claim is, as a matter of law,

---

[13] It is insufficient for Plaintiff to merely allude to statements by confidential witnesses that "Nokia was experiencing problems with its Symbian based operating system and that these problems were causing expected new product launch dates to be pushed back.." AC ¶¶ 42-43. Absent more specific details or factual allegations about Nokia's knowledge, these statements are no different than conclusory allegations by Plaintiff. Furthermore, even as described in the Complaint, these statements do not link the alleged software problems to the slow ramp-up.

defective.  Accordingly, Plaintiff has failed to state a claim under Section 20(a) against any of the Individual Securities Defendants.

## CONCLUSION

The Securities Defendants' motion to dismiss is GRANTED.  The Securities Complaint is DISMISSED.  Having requested leave to amend in the event of dismissal, the Securities Plaintiff may file a motion to amend that attaches a proposed amended complaint within sixty (60) days of this Memorandum Decision and Order if amendment would not be futile.

Dated: New York, New York
     September 6, 2011

SO ORDERED:

GEORGE B. DANIELS
United States District Judge

22